**STATE of Missouri, Respondent,**

v.

**Larry Dale DAVIS, Appellant.**

**No. 61988.**

Supreme Court of Missouri,
En Banc.

Nov. 12, 1980.

Robert G. Duncan, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Nancy Kelley, Asst. Atty. Gen., Jefferson City, for respondent.

SEILER, Judge.

Appellant was convicted of the offense of feloniously receiving stolen property under the old criminal code, section 560.270, RSMo 1969, since the alleged offense preceded the effective date of the revised criminal code. The jury set punishment at one year in the county jail and a $500.00 fine. This case was transferred to this court by the court of appeals under Rule 83.02 after an opinion had been filed. We will treat the case as though here on original appeal. Mo.Const. art. V, § 10.

Appellant was the elected city marshal and police chief of Mound City in Holt County, Missouri. He used his home as his office and headquarters. Prior to his becoming police chief, appellant had worked as a security guard; he had no formal training to be a law enforcement officer.

On July 11, 1977, Bobby Hall discovered that two rifles, a German–made eight millimeter Mauser and a .22 caliber Weatherby semi–automatic, had been stolen from the gun rack of his pickup truck parked outside his father's home in a rural area three miles south of Mound City. Hall and appellant were friends, had taken trips together and purchased guns together. Hall reported the theft to appellant, but was told that he should report the theft to the sheriff since the theft occurred outside appellant's jurisdiction.

Sometime prior to September 11, 1977, two informants, appellant's wife, Kate Davis, and her employer, John King, told Deputy Patterson that they had seen two rifles, a Mauser and a .22 caliber Weatherby, at the home of appellant. Deputy Patterson told informant John King that he needed the serial numbers from the guns and requested that he secure them. King provided two serial numbers, one which matched the number of Hall's stolen Mauser rifle and a second that did not match the serial number of the stolen Weatherby rifle.

On September 12, 1977, after Patterson received a telephone call from King informing him that the rifles were still in appellant's home, Sheriff Hayzlett and Deputy Patterson obtained a search warrant to search appellant's home for the guns. Deputy Patterson called appellant on a police radio and asked him to come to a local gas station restaurant. At approximately 9:30 in the evening appellant met Deputy Patterson and Sergeant Matthews of the Highway Patrol for coffee at the restaurant. The men sat and talked for a while. After they paid for their coffee and stepped outside the restaurant, Deputy Patterson told appellant that the sheriff's office had received information that appellant had two stolen guns at his house. Appellant denied that he had the guns and walked to his police car to drive away. Deputy Patterson went to Sergeant Matthews' patrol car and called Sheriff Hayzlett on the radio. The sheriff then heard appellant call his wife over a citizen's band radio. Within three or four minutes, Sheriff Hayzlett, Deputy Patterson, Sergeant Matthews and three other Highway Patrol officers, and the county prosecutor converged according to plan upon appellant's home to execute the search warrant.

Sheriff Hayzlett and the six other law enforcement officers arrived at appellant's home and had entered it before appellant arrived on the scene. Appellant's son answered the door and said his mother was outside the building and appellant's wife subsequently entered the house through the back door. Appellant arrived moments after the arrival of the sheriff and other officers and the search of appellant's home, his bedroom in particular, commenced. No evidence of the guns was found in the house. The officers then went outside behind the house and decided to look into the cistern, where they eventually found the guns. Appellant, his wife, and one Barbara King, who evidently arrived at appellant's home after the search began, were then arrested. It was not until the trial that the "confidential informants" who supplied the information to support the issuance of the search warrant were identified for the first time as John King and appellant's wife.

When the two guns were found it was discovered that the original scopes of the rifles were missing. One of the scopes was

found on one of appellant's rifles. It was later revealed that the other scope had been traded by appellant at a sporting goods store.

At trial, appellant testified that in July of 1977 he was investigating the unsolved homicide of Chester Leggins when Bobby Hall reported the theft of the rifles to him. Several days after learning of the theft of the guns, appellant was picking up some hay that he kept for his horses at Junior Yocum's barn in Mound City. After removing several bales, appellant saw the stocks of two guns in the hay. He removed the hay covering the guns and found them to be an eight millimeter Mauser and a .22 caliber Weatherby semi-automatic. Appellant took the guns to his office at home where he hid the guns without telling anyone, even his wife, of his discovery. He testified that he considered returning the guns to the barn and staking out the area to see if anyone would come to pick them up. He said he examined and test-fired the guns in an attempt to determine whether the guns could have been used in the unsolved Chester Leggins homicide.

He stated that he never doubted that the two guns were the ones that Bobby Hall had reported as having been stolen. He explained the removal of the scopes from the rifles as an attempt to test the scopes at the homicide scene without anyone becoming aware that he had found the rifles and or that he had suspected Bobby Hall could have been involved in the homicide. He explained that he owned many rifles and scopes and that he inadvertently traded Hall's scope during one of his many gun collection trading transactions.

Appellant also testified that he and Sheriff Hayzlett had had problems in their police relations and that in the past the sheriff had taken credit for appellant's successful police work while giving appellant credit only for assisting the efforts. Because of this previous competition between the Mound City police and the Holt County sheriff, appellant said he did not report the recovery of the rifles to Sheriff Hayzlett. Appellant explained his denial to Deputy

Patterson of having the guns as an angry reaction to what he felt was an insinuation that he had stolen the guns or an implication that he was under an obligation to tell the sheriff whatever information he had uncovered. Appellant said he reconsidered his position after his denial and called his wife over his citizen's band radio and told her where the guns were and instructed her to put them on the back porch. He said he had decided to take the guns to the sheriff. He could not explain why his wife threw the guns into the cistern. When appellant arrived at his home and found the sheriff, deputy sheriff, four Highway Patrol officers and the county prosecutor inside, he became angry that they were conducting the search in front of his children and he did not assist the officers in finding the guns.

On November 28, 1977, the Holt County prosecuting attorney filed an information charging that "on or about the 18th of July, 1977, in Holt County, Missouri, defendant Larry Dale Davis willfully, unlawfully and feloniously received one German Mauser rifle and one .22 caliber automatic rifle, each rifle having a scope attached and the rifles having a combined value of at least $50.00 and both rifles having been stolen from Robert Hall on or about the 11th day of July, 1977, the said Larry Dale Davis knowing at the time he received said property that the property had been stolen and the said Larry Dale Davis received the rifles with the intent to defraud Robert Hall of his lawful interest therein, in violation of V.A.M.S. Section 560.270."

Accordingly, appellant was not charged with stealing the rifles on July 11th, but rather was charged with feloniously receiving them on July 18th, the day he said he found the rifles in a haystack at Junior Yocum's barn. As noted above, appellant was convicted of receiving stolen property under section 560.270, RSMo 1969 of the old criminal code.

On appeal, appellant contends that his conviction was not supported by sufficient evidence to establish that he had received stolen property with the intent to defraud.

He also alleges error in the trial court's overruling his motion to quash the search warrant and the admitting into evidence of the items seized in the search.

■ The offense of receiving stolen property involves elements different from the offense of stealing: "a buying or receiving, *from another,* of property known to *have been stolen,* with intent to defraud." *State v. Kelly,* 365 S.W.2d 602, 606 (Mo. 1963) (emphasis in original). The first element has been stated variously as "the accused must receive the property in some way from another and not be the actual captor of the property . . ." *State v. Montgomery,* 591 S.W.2d 412, 413 (Mo.App.1979), and "the property must be received in some way from another person . . ." *State v. Davis,* 590 S.W.2d 418, 419 (Mo.App.1979); *State v. Inman,* 578 S.W.2d 336, 337 (Mo. App.1979); *State v. Armstrong,* 555 S.W.2d 640, 642 (Mo.App.1977). It is an essential element of receiving stolen property that there be at least two actors involved; the accused must receive the property from another, some person other than the owner. *State v. Montgomery, supra,* 591 S.W.2d at 413; *State v. Armstrong, supra,* 555 S.W.2d at 642.

■ In the case at bar, there is no claim that appellant stole the guns, nor evidence as to the identity of the thief, nor is there any evidence that appellant obtained the guns from another person. The only direct evidence as to appellant's *coming into possession* of the guns was his testimony that he recovered the guns from a haystack while acting in his official capacity as police chief of Mound City. The jury, of course, was not obligated to believe this explanation. However, the only other evidence about appellant's coming into possession of the guns is whatever follows from the facts that Mrs. Davis and her employer, King, told the deputy sheriff that they had seen two rifles at appellant's home and that when the house was searched the guns were found in the cistern, an unusual storage place. Even giving the state every legitimate inference favorable to the verdict, there is no evidence to account for the handling of the property from the time of its disappearance until it came into possession of appellant. Thus, there is no evidence of a thief or fence or anyone from whom appellant is alleged to have received the guns.

■ A conviction for receiving stolen property cannot stand where the evidence fails to show that defendant was the receiver rather than the taker of stolen property.[1] *State v. Delay,* 455 S.W.2d 1, 3 (Mo.1970); *State v. Magers,* 452 S.W.2d 198, 200 (Mo. 1970); *State v. Miller,* 433 S.W.2d 281, 283 (Mo.1968). While an unexplained possession of recently stolen property can give rise to an inference that the possessor is the thief, *State v. Dobson,* 303 S.W.2d 650 (Mo. 1957), possession of recently stolen property is no basis for an inference that the possessor received, rather than stole, the property. *State v. Johnson,* 580 S.W.2d 254, 258 (Mo. banc 1979); *State v. McAnulty,* 491 S.W.2d 259, 260 (Mo.1973); *State v. Magers, supra,* 452 S.W.2d at 200; *State v. Jackson,* 594 S.W.2d 377, 378 (Mo.App.1980); *State v. Davis, supra,* 590 S.W.2d at 419.

The state has failed to make a submissible case of receiving stolen property by neglecting to show that appellant received the stolen property from another with an intent to defraud. *State v. Delay, supra,* 455 S.W.2d at 3; *State v. Miller, supra,* 433 S.W.2d at 283. Accordingly, the judgment must be reversed and the defendant discharged. *State v. Delay, supra,* 455 S.W.2d at 3; *State v. Miller, supra,* 433 S.W.2d at 283; *State v. Jackson, supra,* 594 S.W.2d at 378; *State v. Montgomery, supra,* 591 S.W.2d at 415; *State v. Inman, supra,* 578 S.W.2d at 338; *State v. Armstrong, supra,* 555 S.W.2d at 643.

1. We note that the former stealing statute, section 560.156.4, *RSMo* 1969, permitted prosecution for *theft of a person who appropriates property found under circumstances which* would give the finder knowledge of or means of inquiry as to the true owner. The prosecution before us, however, is not under that statute.

Under the new criminal code, the offense of receiving stolen property has been redefined and, unlike section 560.270, RSMo 1969, for which appellant was tried, now contemplates single–party transactions. We believe what the court of appeals recently said in *State v. Jackson, supra*, comparing the old and new provisions defining the offense of receiving stolen property, is instructive:

"Section 560.270 was obviously intended to punish any 'person who shall buy, or in any way receive ... any property that shall have been [previously] stolen from another.' It is apparent that for there to be a 'person who shall buy' previously stolen property, there must be a two–party transaction between a seller and a buyer. Likewise, in general context of the statute, any 'person who shall ... in any way receive' from another person, denotes a two–party transfer of possession from a donor, giver, passer, etc., to a receiver, recipient, acceptor, etc. This problem appears to have been obviated by the enactment of § 570.080 RSMo 1978 (L.1977 S.B. 60, eff. 1–1–79) which provides: '1. A person commits the crime of receiving stolen property if for the purpose of depriving the owner of a lawful interest therein, he receives, retains or disposes of property of another knowing that it has been stolen, or believing that it has been stolen....' The words 'retains' and 'disposes' can denote single–party transactions which the words in § 560.270 (now repealed) do not."

594 S.W.2d at 378.

The judgment is reversed and defendant is ordered discharged.

All concur.